## In re Anonymous No. 20 D.B. 80

Disciplinary Board Docket no. 20 D.B. 80.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

HAMMERMAN, *Member,* March 31, 1982 — Pursuant to Rule 208(d) of the Pennsylvania Rules of Disciplinary Enforcement, The Disciplinary Board of the Supreme Court of Pennsylvania (board) submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

### I. HISTORY OF PROCEEDINGS

The Office of Disciplinary Counsel filed a petition for discipline against [ ] (respondent) on May 28, 1980, after an order of the Supreme Court dated April 21, 1980, suspended [Respondent] and referred the matter to the Disciplinary Board. The petition alleged pursuant to Rule 208(b)(1) of the Pennsylvania Rules of Disciplinary Enforcement the following charges of alleged misconduct in violation of the Code of Professional Responsibility as follows:

(a) D.R. 1-102(A)(3) — dealing with illegal conduct involving moral turpitude;

(b) D.R. 1-102(A)(4) — dealing with conduct involving dishonesty, fraud, deceit, or misrepresentation;

(c) D.R. 1-102(A)(5) — dealing with conduct that is prejudicial to the administration of justice;

(d) D.R. 1-102(A)(6) — dealing with conduct adversely reflecting upon a lawyer's fitness to practice law; and,

(e) That the conviction of respondent constitutes an independent basis for discipline, pursuant to Rule 203(b)(1), Pennsylvania Rules of Disciplinary Enforcement.

An answer to the petition for discipline was filed on June 26, 1980, and the matter was referred to hearing committee [ ]. The hearing committee consisted of [ ], [ ], and [ ]. A hearing was scheduled for August 6, 1981, at which respondent was unrepresented and testimony taken. Both parties waived the filing of briefs.

The report of the hearing committee was filed on October 20, 1981, in which the committee found violations of Disciplinary Rule 1-102(A)(6); and 1-102(A)(5) and recommended that respondent be suspended from the practice of law for a period of two years effective April 7, 1980. Petitioner filed exceptions to the report of the hearing committee on November 5, 1981.

On November 12, 1981, [A], Esq., entered his appearance for respondent and requested leave to file a brief opposing the exceptions, which was granted. Thereafter, at the time of the board meeting on December 9, 1981, when a recommendation was due, the writer was advised that respondent had moved to have the record and transcript of his trial in the Federal Court made part of this proceeding.

Upon grant of the motion, a request for oral ar-

gument was granted and heard on January 28, 1982, at the offices of The Disciplinary Board at [ ], Pa. The panel consisted of Mary Bell Hammerman, Esq., Chairman, Dennis C. Harrington, Esq., and Herbert J. Johnson, Jr., Esq.

## II. STATEMENT OF FACTS

Respondent is an attorney licensed to practice in Pennsylvania for 29 years. On October 30, 1979, an indictment was filed against respondent in the United States District Court for the Western District of Pennsylvania at no. 79-186 Criminal, therein charging respondent with 11 counts of mail fraud, in violation of Title 18, United States Code, § 1341, and one count of perjury, in violation of Title 18, United States Code, § 1623, as set out with specificity in the indictment.

On February 13, 1980, respondent was adjudged guilty by a jury verdict of the 11 counts of mail fraud and the one count of perjury, as charged, as evidenced by a judgment and probation/commitment order.

At all times pertinent to this indictment, defendant, [Respondent] was a member of the Senate of the Commonwealth of Pennsylvania, representing the [ ] Senatorial District of Pennsylvania.

At all times pertinent to this indictment, defendant, [Respondent], was Chairman of the Senate Corporations Committee and as such was responsible for hiring and supervising administrative and clerical staff for said committee.

At all times pertinent to this indictment, [B] and [C] were personal friends of defendant.

From on or about February 15, 1973, and continuing thereafter to on or about January 15, 1975, in the Western District of Pennsylvania and elsewhere, defendant, [Respondent] devised and

intended to devise a scheme and artifice to defraud the Commonwealth of Pennsylvania and the citizens of the Commonwealth of Pennsylvania, and to obtain money and property by means of false and fraudulent pretenses, representations and promises, well knowing at the time, that the pretenses, representations and promises would be and were false and fraudulent when made, said scheme and artifice being in substance as follows:

It was part of the scheme and artifice to defraud that defendant would and did place, and caused to be placed, [C] on the payroll of the Corporations Committee.

It was further part of the scheme and artifice to defraud that [C] would and did receive a salary from the Senate of the Commonwealth of Pennsylvania, in the form of biweekly checks. The gross amount of [C's] salary was approximately $1,664.25 in 1974 and $332.23 in 1975.

It was further part of the scheme and artifice to defraud that [C] would and did perform no duties or sevices for the Senate Corporations Committee or for the Senate of the Commonwealth of Pennsylvania.

It was further part of the scheme and artifice to defraud that the defendant would and did place and caused to be placed [B] on the payroll of said Corporations Committee.

It was further part of the scheme and artifice to defraud that [B] would and did receive a salary from the said Corporations Committee of the Senate of Pennsylvania in the form of biweekly checks. The gross amount of [B's] salary was approximately $5,265.54 in 1973, $5,849.98 in 1974 and $155.33 in 1975.

It was further part of the scheme and artifice to defraud that from February 15, 1973 to June 11, 1973, [B] would and did perform no duties or serv-

ices for said Corporations Committee or for the Senate of the Commonwealth of Pennsylvania.

It was further part of the scheme and artifice to defraud that from June 11, 1973 until August 11, 1974, [B] would and did perform little, if any, services for the Corporations Committee or for the Senate of the Commonwealth of Pennsylvania.

It was further part of the scheme and artifice to defraud that from August 11, 1974 to January 15, 1975, [B] would and did perform no services for the Corporations Committee or for the Senate of the Commonwealth of Pennsylvania.

On or about the dates listed below in the Western District of Pennsylvania and elsewhere, defendant, [Respondent], for the purpose of executing the above scheme and artifice to defraud and attempting to do so, did knowingly cause to be sent and delivered by the United States Postal Service, envelopes addressed to the persons listed below containing Commonwealth of Pennsylvania treasury checks in the amounts as listed below:

| COUNT | DATE | ADDRESSEE | | AMOUNT |
|---|---|---|---|---|
| 1 | November 13, 1974 | [B] | [address] | $252.34 |
| 2 | November 25, 1974 | [B] | [address] | 252.34 |
| 3 | December 13, 1974 | [B] | [address] | 155.65 |
| 4 | December 26, 1974 | [B] | [address] | 155.65 |
| 5 | January 13, 1975 | [B] | [address] | 155.33 |
| 6 | November 13, 1974 | [C] | [address] | 332.85 |
| 7 | November 25, 1974 | [C] | [address] | 332.85 |
| 8 | December 13, 1974 | [C] | [address] | |
| 9 | December 26, 1974 | [C] | [address] | 332.85 |
| 10 | January 13, 1975 | [C] | [address] | 332.23 |

On or about November 20, 1974, in the Western District of Pennsylvania and elsewhere, defendant, [Respondent], for the purpose of executing the above scheme and artifice to defraud and attempting to do so, did cause to be placed in an authorized depository for mail matter an envelope addressed to [B] [address], containing a letter, to be sent and delivered by the United States Postal Service.

That on or about January 24, 1979, in the Western District of Pennsylvania, defendant, [Respondent], having duly taken an oath that he would testify truthfully in a proceeding before the grand jury of the United States District Court for the Western District of Pennsylvania, which had been duly empanelled and sworn in the United States District Court for the Western District of Pennsylvania, did unlawfully and knowingly make certain false material declarations as herein described.

At the time and place aforesaid, the said grand jury was conducting an investigation into alleged mail fraud, in violation of section 1341 of Title 18, United States Code.

It was material to the said investigation to determine what the working understanding was between defendant, [Respondent], and [B] concerning her employment by the Corporations Committee of the Senate of the Commonwealth of Pennsylvania; to determine whether defendant was aware that [B] was not performing work for the Corporations Committee or the Senate of Pennsylvania; to determine whether defendant was aware that [B] was working for a dentist in Harrisburg at the same time she was on the payroll of the Corporations Committee of the Senate of Pennsylvania; to determine whether defendant was informed by [B] that she was performing no work for said Committee and that she wanted work to do.

After having taken an oath to testify truthfully on the date and at the place alleged in paragraph one of this count of this indictment, defendant, [Respondent], knowingly made false material declarations in response to certain questions propounded to him during the aforesaid grand jury proceedings as set forth below (in this Count "Q" indicates questions propounded to defendant, [Respondent] and "A" indicates answers given by defendant, [Respondent]).

Q. Are you familiar with the name [B] or [B]?

A. Yes, I'm familiar with the name.

Q. And do you recall, first of all, is she a staff employee or was she on the —

A. She was on the Corporations Committee staff, I believe. Yeah, Corporations Committee.

Q. And when did she work, if you can recall?

A. She was employed I think sometime in '73, and I terminated her employment in November '74, I believe. Some of these exact dates, it's been so long.

• • •

Q. Now, was she in Harrisburg the entire time she was on the State payroll, to your knowledge?

A. To my knowledge, she was. And to my knowledge, one time she came back to [ ] County. Her brothers I think built a home for her. But the great majority of the time, I'd say maybe 90 percent of the time, and I'm speaking off my head now, she lived in Harrisburg and she was there in Harrisburg.

Q. All right. Let's start from the beginning. When she first went on the payroll, did she — I mean, was her arrival in Harrisburg simultaneous with the time that she was put on the payroll?

A. That, I don't recall really.

Q. Well, approximately?

A. I would say shortly thereafter.

Q. There was not a long four- or five-month hiatus?

A. I don't think. But again, I don't know really right now. I never —

Q. All right. Now, going back to what her job was, what exactly did she do?

A. Every committee had to maintain an office in the cubicle, in the basement of the Capitol. And her job was to be there.

For instance, each committee gets numerous, I'd say hundreds of inquiries concerning certain legislation that's before the committee.

Other senators want a synopsis of legislation that is before the committee, and they go, they send somebody to go down to that committee and get it. On every bill that's introduced and referred to the committee, we have a synopsis. Because lots of times just reading the bill, nobody knows what it's about. So we ask each senator to—so, that's on file there for the use of the senators or anybody else that wants information.

And then when we had committee meetings, why, her duty was to be there at the committee meetings and more or less take the notes, take the vote, record that, make out the papers necessary for my — as chairman of the committee to present it to the floor of the Senate.

In other words, what her job was—now, whether it was done or not, I don't know. What her job was, was to be there at the committee room downstairs. There was a typewriter there. There were filing cabinets. All the things that anybody — and the telephone, so forth. Anything anybody would need. And her job was to be there and represent the committee. Not necessarily me; she was to represent the committee there.

Q. Was she to be there every working day?

A. That was my understanding, yes, at the time.

• • •

Q. Now, you say that she worked down in the cubicle. Do you know that she worked down in the cubicle or not?

A. I found out later that she hadn't been working too much down there. She was supposed to be there.

Now, may I explain my situation as far as that's concerned?

In those days, we would get to Harrisburg Monday at noon, usually, traveling from [ ]. We would go into session one o'clock, and then have caucus, and then go on the floor, and sometimes we would be on the floor until nine or ten o'clock Monday.

Then, very often we would have a session on Tuesday morning, and go home. So, I was — of course, most of her work is at home anyway, the constituent work, attending meetings, school boards and so forth.

So, during the time —

Q. Was she doing that, too?

A. No, she wasn't. Her job was to be in Harrisburg.

Q. O.K.

A. During the time that, during this particular— and then I was sick. I missed a lot of time. I had myasthenia gravis, and I just did not go down — that is , I could not say whether she was there or not. A few times I inquired about her; she was there. A couple times I inquired with my secretary upstairs, and she would have to call her upstairs and get her over there. And sometimes she would give the excuse she couldn't get a baby-sitter or something like that. But I do know, I thought at the time that [B] was working.

Q. Did she ever tell you that she was not working?

A. No.

Q. Did she ever come to you and say, "I don't have enough to do. Can you give me something else to do?"

A. Never anything about that at all.

Q. Were you aware that she was working for a dentist in Harrisburg at the time she was working for you?

A. I don't recall it. Now, it's not unusual for employees, with the salaries they get down there and the type of living they have, to have part-time jobs.

I would think if she would have told me, I would have inquired about it or something, but I was not aware that she was working.

Q. Why would you inquire about it?

A. Well, I would wonder why, what time it was taking from her work that she was getting paid for. It would put me in a vulnerable situation if she wasn't over there. That is, I had no reason to suspect anything at all, until she moved back to [ ] County and started living there. And then I ascertained that she wasn't going to Harrisburg, and I had my secretary write her a letter telling her that I disapproved of that, and dismissing her from service. And when I dictated the letter to my secretary, [D], she advised me at that time that [B] hadn't been too punctual down there and hadn't been working too much down in Harrisburg.

Q. Did, at any time, did either [C] or [B] come to you and tell you that they weren't doing any work and they wanted work?

A. At no time. At no time.

• • •

That the grand jury testimony of the defendant, [Respondent], as set forth in paragraph 4 of this

count of this indictment as he then and there well knew was false, in that it was not the understanding between defendant and [B] that [B] was to be there in the basement of the Capitol of the State of Pennsylvania every working day; in that defendant was told by [B] that she was not performing any work for the Corporations Committee and that she wanted work to do; in that defendant was aware that [B] was working for a dentist in Harrisburg at the time she was on the payroll of the Corporations Committee of the Senate of Pennsylvania.

The trial of [Respondent], began on December 20, 1979, and continued until February 13, 1980, when he was found guilty by a jury as to counts 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, and 12 of Criminal no. 79-186. On March 18, 1980, respondent was fined $250 on each count for a total of $2,750 and committed to the custody of the attorney general or his authorized representative for imprisonment for a period of six months on the first 11 counts and two years on count 12 which was suspended and he was placed upon probation for a period of three years and to make restitution to the Commonwealth in the sum of $13,000.

On the present charges, respondent served 4½ months at the Federal Correctional Institutions at [ ], and [ ]. While confined at [ ], respondent worked as a law librarian. Respondent had an excellent record and received an early discharge for good behavior.

## III. DISCUSSION

[Respondent] was a State Senator who also was involved in a large practice in [ ] County having been admitted to the bar in 1953. During the course of his state employment, he placed on the Com-

monwealth payroll two women, [C] and [B]. [B] testified that she was on the payroll from February, 1973, until January, 1975 at the annual salary of $8,500 a year receiving her checks by mail every two weeks. She lived in [ ] at that time with her parents and performed no services except two days in the law office of respondent moving to Camp Hill in June, 1973, although she resided in Camp Hill for a period of 18 months, she stated she did very little work having attended two committee meetings for a day each.

[B] further testified that she told respondent she was bored to death and he told her to "take your daughter and sit at the swimming pool." She then obtained part-time work as a dental receptionist for two months but resigned when respondent said "it wouldn't look good if anybody found out." She then removed to Republic and remained on the state payroll for another year doing no work at all.

Respondent was indicted for perjury in that he denied that [B] ever told him she was bored or that he told her to quit her dental receptionist job.

[C] testified that she was on the state payroll for about three months in 1975 receiving bi-weekly checks of $300 by mail sent to her relative in Republic as she still lived in Fort Lauderdale, Fla. She did very little work, removing to South Carolina and remaining on the payroll for another month or two.

The hearing committee, while granting that respondent's guilt was conclusively established by the certificate of conviction, felt that the conduct of respondent was not tainted with the kind of dishonesty, fraud or deceit contemplated under the rules. While the committee admits that the conviction of an attorney for perjury would reflect adversely on his fitness to practice law, it felt that "the respondent's background, his standing in the profession,

any prior disciplinary problems, his health, his financial status, his dependents, the extent of punishment already served, and the prospects of rehabilitation" should be considered. The hearing committee, therefore, recommended that respondent be suspended from the practice of law for a period of two years effective April 7, 1980.

At oral argument on January 28, 1982, respondent's attorney argued that the charges for which he was indicted were not in furtherance of his work as a lawyer and that he did not gain personally in any way from his actions on which the charges were based.

In examining the background of this respondent, we find a hearing committee had recommended suspension from practice for 90 days in 1975 but respondent requested permission to resign and by order of this honorable court was disbarred upon his request on October 20, 1975. Respondent had been administered two informal admonitions prior thereto.

Upon a petition for reinstatement, the Disciplinary Board recommended that the petition of discipline be dismissed and the Supreme Court of Pennsylvania entered an order on June 26, 1978, granting his reinstatement.

Respondent's wife is a former school teacher disabled due to a severe asthmatic condition. Respondent has two daughters; the youngest, 25 years of age, is a lawyer and presently Assistant Public Defender for [ ] County. The other daughter holds a Master's Degree and is in the field of Public Relations in [ ].

Respondent attended West Virginia University, graduating in 1943 with a Bachelor of Arts Degree, and was immediately inducted into the Army shipping out to the South Pacific where he served with

honor as an infantry line officer. Respondent con-
tacted malaria while in the Army, and he claims is
presently suffering from a crippling and fatal mus-
cle disease, myasthenia gravis, which requires
constant medication.

When respondent was discharged from the Army
in 1946, he entered Harvard Law School, but after
two years had to drop out due to recurring bouts of
malaria. Respondent later transferred to
Northeastern University and graduated in 1949
with a Bachelor of Law Degree. However, before
starting his career in law, he was again called up
for military service in the Korean War where he
served until 1952. Respondent was admitted to the
bar in 1953, and in the same year respondent and
his family moved to [   ].

Subsequent to his graduation from Northeastern
University in 1949, respondent served a clerkship
in the law firm of [   ] he also worked for [   ] Casu-
alty Company. Between 1956 and 1963, respondent
was employed by the Liquor Control Board; he
served as a commissioner between 1963 and 1966
and as the county solicitor from 1966 to 1968; re-
spondent ran for district attorney in 1963. In 1970,
respondent was elected to the Pennsylvania State
Senate and re-elected in 1974. Respondent was de-
feated for re-election in the primaries of 1978.

During the time that respondent was serving in
the State Senate, he was also the most active trial
lawyer in [   ] County and as stated by the hearing
committee at no. 9 D.B. 74, "He was and is a one-
man Public Defender's Office for [   ] County; he is
the principal negligence (plaintiffs) lawyer in that
area; he is an extremely busy office lawyer and he is
an active State Senator."

The panel at oral argument was troubled by the
charge of perjury before the grand jury. If the rec-

ommendation of the hearing committee was confirmed, this respondent would be again practicing law while under the probation of the Federal Court after conviction for such charge. In the Matter of Leopold, 469 Pa. 384, 392, 366 A. 2d 277 (1976), the court upheld disbarment pointing out: "The public position of one who is a member of the legal profession is one of great responsibility. Integrity and the exercise of good faith in an attorney's professional engagements are essential for the protection of the public, the courts and the profession itself."

In re Anonymous, 22 D.B. 76, 4 D. & C. 3d 685 (1978) on a conviction of conspiracy to sell and transfer counterfeit obligations of the U.S.: 18 U.S.C.A. §371, respondent was disbarred.

In Office of Disciplinary Counsel v. Troback, 477 Pa. 318, 383 A. 2d 952 (1978) on a charge and conviction of violation of 18 U.S.C.A. §2314, interstate transportation of stolen securities, respondent was disbarred.

In the Troback case, respondent when interviewed by an agent of the FBI stated he knew nothing concerning the bonds. Although prominent and respected, citizens of his county attested to his ability as a lawyer and to his good reputation and character, this honorable court had no hesitancy in concluding Troback had been guilty of conduct which was illegal, dishonest and deceitful.

## IV. CONCLUSION

The brief on exceptions by disciplinary counsel said there are many other cases in which under similar circumstances, lawyers have been disbarred. In fact, disciplinary counsel cites other jurisdictions which have determined that disbarment is often the appropriate discipline for an at-

torney convicted of a crime involving fraud. As this Supreme Court stated in Grigsby:

"The purpose of the Code of Professional Responsibility and the Rules of Disciplinary Enforcement is to protect the public, the profession and the courts. Whenever an attorney is dishonest, that purpose is served by disbarment."

## V. RECOMMENDATION

On the basis of the foregoing, the disciplinary board respectfully recommends to the Supreme Court of Pennsylvania that respondent be disbarred.

Mr. Harrington dissented and would recommend a period of suspension.

Messrs. Daniels and Elliott did not participate in the adjudication.

## ORDER

PER CURIAM, June 17, 1982 — Respondent is hereby suspended from the practice of law for a period of five years, retroactive to the date of the original suspension, April 21, 1980.

Mr. Justice Larsen dissents and would accept the recommendation of the disciplinary board for the sanction of disbarment.